IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER LUNSFORD, | ) | CASE NO. 5:17-CV-2164 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Christopher Lunsford ("Lunsford") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for child's insurance benefits ("CIB") and Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 12.

For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Lunsford filed his applications for CIB and SSI in July 2014, alleging a disability onset date of December 17, 2012. Tr. 15, 148, 249. He alleged disability based on the following: anxiety, panic attacks, obsessive compulsive disorder, and paranoia. Tr. 291. After denials by the state agency initially (Tr. 110-111) and on reconsideration (Tr. 146-147), Lunsford requested an administrative hearing (Tr. 193). A hearing was held before Administrative Law Judge ("ALJ") Susan Smoot on October 25, 2016. Tr. 34-76. In her December 1, 2016, decision (Tr. 15-26), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Lunsford can perform, i.e. he is not disabled. Tr. 24. Lunsford requested review

1

of the ALJ's decision by the Appeals Council (Tr. 248) and, on August 15, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Lunsford was born in 1994 and was 19 years old on the date his applications were filed. Tr. 17. He dropped out of school after tenth grade and thereafter obtained his GED. Tr. 42. He has worked sporadically but could never maintain a job. Tr. 43.

### B. Relevant Medical Evidence[1]

On July 9, 2013, Lunsford saw John Clark, M.D., at the cardiology clinic at Akron Children's Hospital. Tr. 459. He complained of a history of palpitations and heart pounding, and then he would panic, causing shortness of breath, dizziness and fatigue. Tr. 459. His symptoms lasted for hours and had remained constant the week leading up to his visit with Dr. Clark. Tr. 459. He smoked half a pack of cigarettes a day and was not on any medication. Tr. 459. His physical exam findings were normal. Tr. 459. Dr. Clark commented that Lunsford's symptoms were "still consistent with anxiety" but, to be sure, placed a Holter monitor on him to record his heart rhythm; the results were normal. Tr. 460, 462.

On October 17, 2013, Lunsford presented to the emergency room at Aultman Hospital complaining of a fast heart rate. Tr. 594. Upon exam, he was in no apparent distress and had a "regular rate and rhythm slightly tachycardic." Tr. 594. He reported having been prescribed metoprolol, a beta blocker, but that, after a recent arm surgery, his metoprolol dosage had been

---

[1] Lunsford only challenges the ALJ's findings regarding his POTS impairment. Accordingly, only the medical evidence relating to this impairment is summarized and discussed herein.

2

decreased. Tr. 594. The attending doctor increased his metoprolol to pre-surgery levels and he was discharged. Tr. 594.

On January 1, 2014, Lunsford returned to the emergency room at Aultman Hospital complaining of an elevated heart rate and chest discomfort. Tr. 577. Lunsford reported his long-standing history of chronic tachycardia and explained that he had been trying to take himself off his metoprolol in order to undergo a urine test but that, when he stopped taking his metoprolol, he got worse tachycardia and felt his heart pounding in his chest, which then caused a panic attack. Tr. 578. He also explained that he drank alcohol almost daily to help him overcome his problems. Tr. 578. Upon exam, he was in no acute distress and his breathing and heart rate were normal. Tr. 578. He was treated for acute chronic tachycardia and advised to follow up with his treating physician, Dr. Bonavita. Tr. 579.

On March 9, 2015, Lunsford saw Mohamed Hegazy, M.D., at the Cleveland Clinic Neurology department complaining of memory loss, worse over the last two years. Tr. 1097. Lunsford detailed a history of recurrent head traumas. Tr. 1097. He also reported postural lightheadedness and tachycardia without syncope. Tr. 1097. His physical exam findings were largely normal, with the exception of impaired delayed recall, 1 out of 3. Tr. 1098-1099. Dr. Hegazy's impression was recurrent concussion, post-concussion syndrome with psychological and cognitive impairment, neck pain, and postural lightheadedness/tachycardia and to rule out postural orthostatic tachycardia syndrome ("POTS"). Tr. 1099.

A tilt table test was performed on May 11, 2015, and was notable for orthostatic tachycardia. Tr. 1108.

On August 15, 2015. Lunsford saw Robert Wilson, D.O., at the Cleveland Clinic Neurology department.  Tr. 1093.  Lunsford's examination findings were normal.  Tr. 1095.  Dr. Wilson gave plaintiff a number of care instructions for POTS, including making postural changes (like sitting to standing) slowly, drinking water frequently, increasing sodium, avoiding large meals and alcohol, performing lower extremity exercises (walking, squatting, stationary bicycling), crossing and elevating his legs, raising the head of his bed, and using elastic support stockings.  Tr. 1096.

On February 1, 2016, Lunsford visited a medical genetics clinic, upon referral from Dr. Wilson, to explore whether he had mitochondrial disorder.  Tr. 1263.  Lunsford reported that he lived with his girlfriend, who was 7 months pregnant, and that he had been working at a sandwich shop but had quit a few days prior to the visit.  Tr. 1266.  His examination findings were normal.  Tr. 1268.  His "clinical picture" did not support mitochondrial disorder and metabolic screening was ordered to rule out a metabolic issue.  Tr. 1268.

Lunsford returned to Dr. Wilson on March 11, 2016.  Tr. 1088.  He reported more body and neck pain.  Tr. 1089.  His exam findings were normal, he had "full power" in his legs and arms, and he could rise from his chair and ambulate without help.  Tr. 1091-1092.  Dr. Wilson diagnosed POTS, anxiety disorder, panic attack, a history of social stressors, body pain, and "reported immune reduction by his account."  Tr. 1092.  He recommended blood work-ups.  Tr. 1092.

Lunsford next saw Dr. Wilson on August 9, 2016.  Tr. 1085.  He reported that his depression was stable and that he had not gone to cardiac rehab.  Tr. 1085.  Dr. Wilson wrote, "Recommended disability with his pots and mental health."  Tr. 1085.  Lunsford's exam findings were normal, including "full power" in his arms and legs.  Tr. 1086-1087.  Dr. Wilson's

4

impression was adrenergic POTS and depression and anxiety. Tr. 1087. He recommended handicapped parking, above-the-knee surgical stockings, and blood work-ups. Tr. 1087.

**C. Function Report**

On July 31, 2014, Lunsford filled out a function report. Tr. 266-273. He stated that he has panic attacks, paranoia, a racing heart, and that he cannot function. Tr. 266. He was obsessed with his health. Tr. 266. His medication made him tired. Tr. 266. Activity made his heart race. Tr. 271.

**D. Medical Opinion Evidence – Treating Source**

On August 9, 2016, Dr. Wilson completed a medical source statement on behalf of Lunsford. Tr. 1076-1080. Dr. Wilson wrote that Lunsford's diagnosis was POTS and his prognosis was poor due to symptoms of syncope, dizziness, tachycardia, weakness, and chest pain. Tr. 1076. Lunsford could walk 1-2 blocks before needing to stop and rest, sit for 30 minutes at a time for 2 hours total in a workday, and stand for 20 minutes at a time for 2 hours total in a workday. Tr. 1077. He would need to change positions from standing to sitting to walking and would need unscheduled breaks lasting 20-30 minutes every 2-4 hours due to muscle weakness, pain and chronic fatigue. Tr. 1077-1078. With prolonged sitting, Lunsford would need to elevate his legs at a 45 degree angle for 20-30% of the workday. Tr. 1078. He could never lift fifty pounds and could rarely lift 10-20 pounds. Tr. 1078. Dr. Wilson did not indicate how frequently Lunsford could lift less than 10 pounds. Tr. 1078. He could never perform any postural activities such as twisting, stooping, crouching/squatting, or climbing stairs. Tr. 1078. He could only use his arms and hands for ten percent of the day. Tr. 1079. He would be off task more than 25% of the day, he was "incapable of even 'low stress' work," he had good and bad days, and he would miss more than 4 days per month. Tr. 1079.

### E. Testimonial Evidence

#### 1. Lunsford's Testimony

Lunsford was represented by counsel and testified at the administrative hearing. Tr. 38. He is single and lives with his grandmother. Tr. 42. He has a six-month-old son. Tr. 42. He had a driver's license but lost it after he got a DUI in December 2015; he then got another DUI in January 2016. Tr. 42, 47. His grandmothers drive him around or arrange rides for him. Tr. 42. He spends time with his son but can't be alone with him; due to all the things going on, he "can't do it by myself." Tr. 48. He may get dizzy and have to lie down, or his son may need to be fed. Tr. 49. He does not do any chores around the house. Tr. 49.

When asked what prevents him from working full time, Lunsford stated chronic fatigue, brain fog, severe pain in his neck, back, knees and head, blurry vision, and a really bad memory. Tr. 44. He constantly has to ask questions on what to do and his last job he had to call off three days in a row because he was too fatigued to get out of bed. Tr. 44. His last job was delivering for a sandwich shop; he also worked at a pizza shop, a bakery, and taking care of special needs people. Tr. 44.

His current problems started when he was about six years old. Tr. 44. He fainted, had syncope, and was hospitalized for a few days at Akron Children's Hospital. Tr. 44. He started using alcohol at 17 because it helped with a lot of his symptoms, his pain and his anxiety. Tr. 45. He is working on things a lot better now that he knows his diagnosis. Tr. 45. His doctors are working further with him to help him better deal with his pain and symptoms, rather than drinking. Tr. 45-46. The last time he drank was "Friday." Tr. 46. He never had a problem with street drugs; the last he tried anything was a few months prior to the hearing at a friend's house, where he was given Suboxone. Tr. 46. He got "severely sick from it" and went to the hospital.

6

Tr. 46.  The last time he did marijuana was about two weeks prior to the hearing.  Tr. 46.  When asked if he had ever been in treatment for drugs and/or alcohol, Lunsford stated, "Yes.  I'm currently in treatment."  Tr. 46.  He entered treatment at the behest of his counselor who treats him for pain and also court-ordered treatment.  Tr. 46-47.

When asked about his pain, Lunsford stated that he had pain in his neck, shoulders, head, chest, back and knees.  Tr. 47.  It was suggested that he get massages and anything else that can help him get the knots out of his back.  Tr. 47.  His pain and fatigue is why he can't get out of bed; he has to take Advil as soon as he wakes up.  Tr. 47-48.  Once it kicks in, after about an hour, he can get out of bed and shower.  Tr. 48.  That takes about two hours, and then he sits down on his bed, props up his legs, and waits for his medications to somewhat work.  Tr. 48.  With his legs propped up he can play on the TV or his phone.  Tr. 49.  In addition to Advil, he takes metoprolol, Klonopin, Prozac, Prilosec, and clonidine.  Tr. 48.  His medications work about 20% and it is still trial and error with them.  Tr. 49.  At the hearing, his pain was an 8/10.  Tr. 50.  He had his legs propped up so his blood did not pool into his legs.  Tr. 50.  He stated that Dr. Wilson "recommends I always have my legs propped at a 45 degree angle."  Tr. 51.

Lunsford testified that he sleeps anywhere from zero to 20 hours a day.  Tr. 50.  When he does not sleep it is mainly from chest pain and a fast heart rate.  Tr. 50.  Also brain fog and strain on his neck and back.  Tr. 50.  When his body gives in after not having slept, however, he can sleep "a good 20 hours straight."  Tr. 51.  He has no good nights of sleep.  Tr. 58.  He also used to drink alcohol to fall asleep.  Tr. 51.  He has had periods of time when he stayed sober, such as when he was in jail for 53 days, and then 3-4 months after that, although he was not completely sober.  Tr. 52, 54.  His symptoms were not better or worse when he was drinking.  Tr. 55.  While in jail he had heart palpitations and a rapid heartbeat also; "I didn't get out of bed one time."  Tr.

7

52. He also could not eat anything and he lost 45 pounds. Tr. 53. They did not treat him with any medication when he was in jail. Tr. 53.

Lunsford testified that he has had about 4 or 5 overnight emergency room visits. Tr. 55. He has been in mental health counseling since he was two years old. Tr. 55. He saw his first cardiologist when he was six. Tr. 56. There is no medication that makes his POTS go away. Tr. 56. He just does what they suggest, like wearing leg stockings or propping up his feet. Tr. 56. He was unable to do cardiac rehab because his symptoms were too bad, so he stopped. Tr. 56. "[T]here's many more tests to come." Tr. 56. He drinks three liters of water a day and uses a heating pad. Tr. 56. When his symptoms get bad he lies down in his room, takes all his medication and hopes that the pain goes away. Tr. 57. He lies down for days, weeks, continuously, without getting up. Tr. 57. He pees in a bottle if he has to. Tr. 57. He stays away from grocery stores; when his mother used to make him go, he would have to use a scooter to ride around because he was unable to walk. Tr. 58. His mother was a meth addict and, growing up, they moved a lot (around 45 times) and he went to 7 or 8 different schools. Tr. 60-61.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Ted Macy testified at the hearing. Tr. 64-75. The ALJ asked the VE to determine whether a hypothetical individual with Lunsford's age, education and work experience could perform any work if the individual had the following characteristics: can perform work at all exertional levels; can perform simple routine tasks but not at a production rate pace and with few changes in a routine work setting with such changes explained in advance; and can have occasional superficial contact with supervisors, co-workers and the general public. Tr. 64-65. The VE answered that such an individual could perform work as a laundry worker (180,000 national jobs); wire worker (105,000 national jobs); electronics worker

8

(60,000 national jobs); and packager (170,000 national jobs). Tr. 65-66. The ALJ asked the VE if his answer would change if the individual had to avoid moving mechanical parts and unprotected heights and the VE stated that his answer would not change. Tr. 66. The ALJ asked the VE if his answer would change if the individual would need to elevate his legs during the workday and the VE answered that his answer would change, explaining that some jobs mentioned would allow for such a limitation but most would not. Tr. 66-67.

The ALJ asked the VE if the individual described in the first hypothetical could perform work if the individual was limited to sedentary work and the VE replied that such an individual could perform work as a table worker (54,000 national jobs); final assembler (90,000 national jobs); and bonder (40,000 national jobs). Tr. 67. The ALJ asked the VE if his answer regarding having to elevate legs throughout the day would change if the individual were limited to sedentary work and the VE stated that his answer would not change; leg elevation may not be permitted in many worksites. Tr. 68. The ALJ asked the VE what percentage of time a worker could be off-task or absent and still remain competitively employable and the VE answered that no more than 10% off task time would be acceptable and no more than one absence a month. Tr. 68-69.

Lunsford's attorney asked the VE whether his prior response to the ALJ's question with respect to leg elevation, i.e., that some employers would permit it, included employers in a competitive work environment or whether it would be an accommodation. Tr. 69-70. The VE replied that some employers would permit it and that he would not consider it an accommodation. Tr. 70. Lunsford's attorney asked whether the individual first described by the ALJ would be employable if he needed to keep his legs elevated at a 45 degree angle 20-30% of the time spent in a seated position and the VE answered that such an individual would be

9

employable. Tr. 70. He explained that most situations would not permit it but that he has seen some that have. Tr. 70. He could not provide numbers. Tr. 71. Lunsford's attorney asked the VE whether, in situations the VE has seen that has allowed the type of leg elevation described, the VE had investigated to discovery whether the worker is a family friend or had been employed for 30 years and the VE stated that he had not investigated. Tr. 71.

Lastly, Lunsford's attorney asked the VE whether the first hypothetical individual described by the ALJ could perform work if that person could seldom remember information immediately after oral presentation and 25-30 minutes after visual presentation. Tr. 73. The VE stated that there would be no jobs for such an individual. Tr. 73.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her December 1, 2016, decision, the ALJ made the following findings:

1. Born in 1994, the claimant had not attained age 22 as of December 17, 2012, the alleged onset date. Tr. 17.

2. The claimant has not engaged in substantial gainful activity since December 17, 2012, the alleged onset date. Tr. 17.

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

11

3. The claimant has the following severe impairments: generalized anxiety disorder, history of alcohol abuse disorder, depressive personality disorder, antisocial traits, postural tachycardia syndrome (POTS), and post-concussion syndrome. Tr. 17.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 18.

5. The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that he can have no exposure to moving mechanical parts or unprotected heights. He can perform simple, routine tasks, but not at a fast production rate pace. There must be few changes in a routine work setting, with those changes explained in advance. He could have occasional superficial contract with co-workers, supervisors, and the general public. Tr. 19.

6. The claimant has no past relevant work. Tr. 24.

7. The claimant was born in 1994 and was 18 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 24.

8. The claimant has a limited education and is able to communicate in English. Tr. 24.

9. Transferability of job skills is not an issue because the claimant does not have past relevant work. Tr. 24.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 24.

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 17, 2012, through the date of this decision. Tr. 25.

## V. Plaintiff's Arguments

Lunsford argues that the ALJ erred because she did not give "controlling" or "great" weight to Lunsford's treating physician. Doc. 13, p. 1.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Lunsford argues that the ALJ erred because she did not give "great" or "controlling" weight to Dr. Wilson's opinion. The ALJ noted that Dr. Wilson treated Lunsford at The Cleveland Clinic Neurology Clinic. Tr. 23. The ALJ considered Dr. Wilson's opinion:

> On August 9, 2016, Dr. Wilson filled out a form designed to assess the claimant's physical limitations. He opined that the claimant could lift or carry rarely [] 10-20 pounds, could never twist, stoop, crouch, climb stairs or ladders, would need to have his legs elevated 20% to 30% of an eight-hour workday, and could sit for only two hours and stand or walk for only two hours in an eight-hour workday (25F/2-3, duplicated at 26F). Little weight is given to this opinion, because it is not in accordance with Dr. Wilson's own record. Dr. Wilson did diagnose the claimant with POTS, but his notes encouraged exercise and did not appear to indicate that the claimant was in any acute distress. Thus, Dr. Wilson's own record does not support his rather restrictive opinion. Nonetheless, the undersigned has limited the claimant to work at the sedentary exertional level in order to account for any potential difficulties emerging from the claimant's POTS or post-concussion syndrome.

Tr. 23-24.

Lunsford argues that the ALJ's reasons for discounting Dr. Wilson's opinion are "clearly not good reasons." Doc. 13, p. 10. The Court disagrees. The ALJ gave "good reasons" when she remarked that Dr. Wilson's opinion is inconsistent with and unsupported by his own treatment notes. *See* 20 C.F.R. § 416.927(c). Lunsford asserts that the ALJ did not adequately explain her reasoning but, again, the Court disagrees. The ALJ made clear that Dr. Wilson's opinion, that Lunsford was severely restricted in every area of his functioning, was inconsistent with the fact that Dr. Wilson had encouraged Lunsford to exercise and that physical exam findings were normal during visits. In other words, nothing that Dr. Wilson observed or recommended during his treatment of Lunsford matched how severely limited Dr. Wilson opined Lunsford to be in the sheet he filled out for Lunsford's disability application. The ALJ did not err, her decision is supported by substantial evidence, and must, therefore, be affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**

IT IS SO ORDERED.

Dated: August 30, 2018

 */s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge